Fuchsberg, J.
(dissenting). Section 1116 of the Public Health Law, and its definitional companion, section 1115, are neither unique nor novel. (Cf Matter of Sidebotham, 12 Cal 2d 434, 437-438; see 1A Antieau, Municipal Corporations Law, § 8A.21.) They are an exercise by the State of its police power to provide for the care, health and protection of the public by *659 seeking to assure adequate and satisfactory water and sewage facilities for people moving into new population areas.
Since the enactment of then section 89 of the Public Health Law in 1933 (L 1933, ch 403), they have continued virtually unchanged, except for an amendment in 1952 (L 1952, ch 66) which reduced from 10 to 5 the minimum number of plots that had to be involved for the statutes to apply. (See 22 Opns State Comp, 1966, p 44; .20 Opns State Comp, 1964, p 44; 1964 Opns Atty Gen 108; 1950 Opns Atty Gen 161.)
In all those years, they never have contained, and do not now contain, language restricting their reach to those who overtly hold themselves out as subdividers; they speak rather of the actuality of subdividing, not the pronouncements of those engaging in it. To now read the statutes otherwise by failing to apply them to the present case would be to drain them of power, to achieve the beneficial public purpose for which they have so long existed. Review of the facts in this case, undisputed as they are in the main, makes this crystal clear.
Petitioners are not strangers to land ownership who stumbled into this situation willy-nilly. However it was originally assembled, when they inherited the property in August of 1962 it was one continuous stretch of farm land. They sold two plots later that year, one as a camp. There was no further sales activity until 1965. Petitioners appear to have then embarked on an intensive campaign to sell off the property piece by piece. By 1967, within the short space of about two years, they had conveyed no less than 14 plots to separate buyers; within a short time dwellings had actually been erected by 11 of the 14 purchasers. But no map or plans, as required by section 1116, had been filed with the local health department governing the Town of Holcott, Greene County, where the property was located.
Nor were these filed by 1970, when the Department of Health intervened, though the number of sales then had reached 27, and 20% of the property had been deeded away among 27 new and different owners. The rest remained for sale. Every single one of the 27 sales had been made to an individual. Inescapably one must conclude here that the use intended by these buyers from the very beginning was residential in character. Without exception, every single structure built by them was in the nature of a dwelling, two being of the trailer type and the remainder conventional houses.
*660 The parcels, as found by the department’s hearing examiner on the basis of recorded deeds and the Town Assessor’s records, met the definitional requirements of section 1115 that they be along an existing "street, road highway or right-of-way”. Because of the irregular and hilly terrain, the sizes of the parcels sold varied, but they all were limited in acreage. Fully three quarters of them consisted of five acres or less, making them, where located, unsuitable for other than residential purposes (cf. Hornbeck v Towner, 14 AD2d 646).
Under these circumstances, it would cast common sense to the winds to fail to infer that petitioners knew that the parcels of their property were being marketed for residential use and that, however they may have originally contemplated it, the disposal of their property was in fact eventuating into the form of a realty subdivision. And certainly the word "residential” is of sufficient common usage for it to have been understood by them without special definition. As a term "used in contradistinction to 'business’ or 'commerce’ ” (77 CJS, Residential, p 308; cf. Matter of Penn Cent. Co. v Johnston, 32 AD2d 718), it applies fully to this present case where there has never been a whisper of a suggestion that the latter uses were ever contemplated by anybody. Also, from the questions that inevitably arise during negotiations for such sales, petitioners can hardly have failed to become conscious of the motivations of their purchasers. And, even if the intended purpose of any single purchase somehow had been shrouded in mystery, it was no longer possible for the petitioners to have blinded themselves to reality once buyer after buyer after buyer constructed a residence and concerned himself with the associated essential problems of water and sewage.
But if any conjecture at all as to petitioner’s clear understanding of what was going on were possible, it was dissipated when, on October 23, 1967, following the sale of the 14 parcels, the department sent written notification to the petitioners advising them that the State of New York regarded the ongoing sales of the lots to have assumed the character of a subdivision, and referring them to the appropriate sections of the Public Health Law. The receipt of the notification is not denied. It was ignored. Petitioners were not much more responsive when, their sales having by then nearly doubled in number, in answer to another letter from the department dated June 1, 1971, they replied that they were negotiating *661 with a land surveyor who would file plans for them. Such plans were never filed. Nor was the surveyor, though named in the letter of reply, produced as a witness at the hearing.
At the hearing, petitioners offered no proof of any kind, whether lay or expert, to support any possible claim that the parcels of land had been sold with any other purpose in mind than their use as homesites. In short, there was not the slightest effort to put any different light on what had, for at least the three years since the department’s 1967 letter, come to be a knowing and defiant promotion of a residential realty division in open violation of the Public Health Law.
Therefore, it appears almost impossible under the facts of this case to escape the conclusion that the commissioner’s determination was supported by such substantial evidence as to interdict judicial rejection. It is no less so because petitioners did not, in the course of the promotion of the sale of their property, formally use the word "subdivision” or advertise it as such. Those would only have been evidentiary factors and it is inconceivable, on the record here, that they could have affected the decision. As was said in Hornbeck v Tower (14 AD2d 646, 647, supra): "[T]he defendant never filed any plans for a subdivision with the department and the broad policy and sweeping language of section 1115 supports the conclusion that at some point in time * * * the * * * initial solid tract of land became a subdivision within the meaning of the Public Health Law and [appellants were] thereby duty bound to satisfy the Department of Health that there were 'methods for obtaining and furnishing adequate and satisfactory water supply and sewerage facilities to said subdivision’.”
Needless to say, this is not a case involving few and random sales of parcels of land, made on an unconcentrated pace, over many years, to nonresidential as well as residential users, and for which there are explained reasons negativing an intention to subdivide. In such a case it might be possible that the commissioner who, it is to be noted, took no action here until the violation had become flagrant might, conceivably, have found that there was no subdivision.
But for the court to decide that section 1116 is inapplicable to facts which are as revealing and as compelling as those in the present case is to undermine the effectiveness of a statute which has played an important role in health enforcement for over 40 years, all the more so now that the regulation of land *662 use has come to be a matter of overriding and almost universal public concern.
Finally, the strength of this case only underlines the fact that the determination of the commissioner was far from arbitrary or capricious. (Matter of Fisher [Levine], 36 NY2d 146, 150; Matter of Marsh [Catherwood] 13 NY2d 235, 239.)
Accordingly, we would reverse the order of the Appellate Division and reinstate the Commissioner of Health’s determination.
Chief Judge Breitel and Judges Gabrielli and Wachtler concur with Judge Cooke; Judge Fuchsberg dissents and votes to reverse in a separate opinion in which Judges Jasen and Jones concur.
Judgment affirmed.